UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

     -against-

EDWIN MARQUEZ,

       Defendant-Appellant.

------------------------------------------------------------X

MEMORANDUM AND ORDER
12-cr-0376 (WFK) (VVP)

**WILLIAM F. KUNTZ, II, United States District Judge**

  Following a bench trial before the Honorable Magistrate Judge Viktor V. Pohorelsky, Edwin Marquez ("Defendant") was convicted of (1) disorderly conduct, in violation of 36 C.F.R. § 2.34(a)(1); and (2) interfering, threatening, resisting, or intimidating a government employee or agent engaged in an official duty, in violation of 36 C.F.R. § 2.32(a)(1).[1] Magistrate Judge Pohorelsky sentenced Defendant to a fine of $100 and a special assessment of $10 for each count.

  On appeal, Defendant argues the evidence was insufficient to support a guilty verdict on the disorderly conduct charge because the Government failed to prove Defendant's conduct took place in public or that Defendant had the requisite *mens rea*. Defendant also argues the Government failed to prove he had the *mens rea* necessary to support a guilty verdict on the interference charge. Finally, Defendant contends that several of Magistrate Judge Pohorelsky's evidentiary rulings constituted reversible error. This Court rejects all of Defendant's arguments, and AFFIRMS both convictions.

---

[1] At the end of the trial, Magistrate Judge Pohorelsky acquitted Defendant of a third charge for violating closure limit restrictions, in violation of 36 C.F.R. § 1.5(f). Apr. 30, 2012 Bench Trial Transcript ("Tr.") at 196:5–197:2.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On appeal from a judgment of conviction, this Court reviews the convicting court's factual determinations in the light most favorable to the government. *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005).

### I. Events at Canarsie Pier

At about 2:00 a.m. on May 30, 2011, United States Parks Police Officer Steven Etzel ("Officer Etzel") announced through his vehicle's public address system that Canarsie Pier was closing and directed all vehicles to exit the pier. Tr. at 14:8–10, 19:6–19:15, 20:14–21:10, 56:25–57:11, 199:1–8. At the time, there were about thirty vehicles in the parking lot. *Id.* at 19:16–17, 21:4–5, 56:22–24, 199:9–10. All but one of the vehicles left the parking lot within fifteen minutes of Officer Etzel's announcement. *Id.* at 19:16–18, 21:11–15, 57:12–21, 199:11–14. Officer Etzel also saw three fishermen on the southeast corner of the pier, although their precise location and distance from the Officer are not evident from the record. *Id.* at 21:16–18, 104:3–7, 199:14–15.

Officer Etzel drove his unmarked vehicle across the parking lot and parked near the remaining car. *Id.* at 19:18–19, 20:25–21:1, 21:19–21, 57:25–58:5, 199:16–18. Officer Etzel, who was dressed in uniform, exited his vehicle and walked toward the remaining car with a flashlight. *Id.* at 19:19–20, 21:21–23, 199:18–19. As he approached the vehicle, Officer Etzel noticed that the car was running, its lights were on, its windows were down, the air conditioner was operating full blast, and the radio was playing loudly. *Id.* at 19:20–23, 199:21–23. Inside the vehicle, a man wearing sunglasses and sweating profusely "appeared to be sleeping" in the reclined driver's seat. *Id.* at 19:23–25, 21:22–23, 199:19–21.

2

Officer Etzel announced twice that he was with the police, that the parking lot was closed, and that the man in the vehicle needed to leave. However, Officer Etzel received no response to either announcement. *Id.* at 20:1–2, 21:24–22:18, 199:24–25. Officer Etzel then reached in to the vehicle and conducted a sternum rub on the man to wake him up. *Id.* at 22:20–23, 199:25–200:3. When that failed to awaken the man, Officer Etzel conducted a second, harder sternum rub, finally awakening the man. *Id.* at 22:23–25, 200:3–4.

Once the man was awake, Officer Etzel explained that he was with the police and that the pier was closed. *Id.* at 23:4–6, 200:10–11. Officer Etzel asked the man for identification, and the man handed him a driver's license, which identified him as Defendant Edwin Marquez. *Id.* at 23:7–9, 24:1–22, 200:7–8. Believing Defendant to be under the influence of alcohol or drugs, Officer Etzel asked Defendant if there was someone who could pick him up or if he had money for a taxi. *Id.* at 26:20–23, 29:24–31:5, 200:11–14. Defendant's response to that question is not in the record. *See id.* at 31:6–23.

Shortly thereafter, Defendant offered to allow Officer Etzel to search his vehicle and stepped out of the car. *Id.* at 32:18–23, 200:14–16. Officer Etzel looked down and saw what he believed to be a partially smoked marijuana cigarette on the vehicle's step. *Id.* at 32:23–25, 200:17–20. As Officer Etzel reached for the cigarette, Defendant said "Don't throw that shit in my car. It's not mine," or words to that effect. *Id.* at 33: 4–13, 200:20–21. Defendant grabbed Officer Etzel's wrist, causing Officer Etzel to drop the cigarette and Defendant's driver's license. *Id.* at 33:13–14, 37:11–12, 76:2–13, 200:21–23. Officer Etzel pulled away, grabbed Defendant's right arm, and tried to get his handcuffs out so he could arrest Defendant for assault. *Id.* at 33:17–20, 37:12–15, 80:1–9, 200:23–25.

Defendant pulled away from Officer Etzel, ran to the back of Defendant's vehicle, opened the rear hatch, and reached into the back of the vehicle with both hands. *Id.* at 34:2–7, 37:14–16, 39:18–40:1, 80:10–82:6, 200:25–201:4. Officer Etzel grabbed his taser and yelled three times, "Get on the ground. Get on the ground or you're going to get tased." *Id.* at 34:4–9, 37:16–20, 40:6–7, 201:5–7. After the second or third command, Defendant got down into a "pushup position" with arms extended and one leg bent "like a sprinter." *Id.* at 34:10–13, 37:17–22, 40:14–17, 201:7–8. Immediately thereafter, Defendant got up and ran toward the driver's door of his vehicle. *Id.* at 34:15–16, 37:23–25, 41:5–6, 201:8–9. Officer Etzel tased Defendant in the back, but the taser malfunctioned and had no effect. *Id.* at 34:16–18, 37:25–38:3, 41:6–8, 201:9–11. Defendant jumped into the open front door of his vehicle and drove out of the pier and onto the Belt Parkway with the door and trunk of his vehicle still open. *Id.* at 34:19, 36:5–7, 41:20–25, 42:2–6, 55:8–11, 201:12–13.

Officer Etzel started to pursue Defendant, but chose not to follow Defendant onto the parkway because he feared a car chase with a potentially intoxicated driver might endanger the public and because he knew he could track down Defendant through his license and vehicle plate number. *Id.* at 42:2–16, 201:14–16. Officer Etzel returned to the pier and retrieved Defendant's license from the ground. *Id.* at 43:1–10, 201:16–18.

Defendant went to the police station days a few days later, at which time he was given three violation notices for 1) interfering, threatening, resisting, or intimidating an officer; 2) disorderly conduct; and 3) violation of closure limit restrictions. *Id.* at 83:15–85:4, 108:3–6; Dkt. No. 1 (violation notices).

## II. Trial

On April 30, 2012, Magistrate Judge Viktor V. Pohorelsky held a bench trial to determine whether Defendant was guilty of (1) disorderly conduct, in violation of 36 C.F.R. § 2.34(a)(1); (2) interfering, threatening, resisting, or intimidating a government employee or agent engaged in an official duty, in violation of 36 C.F.R. § 2.32(a)(1); and (3) violating closure limit restrictions, in violation of 36 C.F.R. § 1.5(f). At trial, the Government presented testimony from one witness: Officer Etzel. Tr. at 13:19–136:5. Defense counsel likewise presented testimony from one witness: Defense Investigator William Von Hoene. *Id.* at 160:11–165:24. In addition, the parties stipulated to the content of 1) a report by Sergeant Rodriguez;[2] 2) medical testimony by two physicians who treated Defendant on multiple occasions, one of whom treated Defendant for a medical condition regarding his left hand and for lesions on his back the date after the events at issue in this action, while the other treated Defendant on multiple occasions from July 2011 to January 2012 for the condition regarding his left hand; 3) testimony by United States Park Police Investigator Danny Ng, and 4) United States Park Police records for June 1, 2011. *Id.* at 154:19–159:6, 166:12–22, 167:24–168:4.

At the end of the bench trial, Magistrate Judge Pohorelsky granted Defendant's motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure with respect to violation of closure limit restrictions, finding there was no evidence that Defendant knowingly stayed in the park beyond the closure time. *Id.* at 196:7–197:2. Magistrate Judge Pohorelsky denied Defendant's Rule 29 motion with respect to the remaining charges and found Defendant guilty of (1) disorderly conduct and (2) interfering with and resisting a government employee or agent. *Id.* at 197:3–198:25, 201:24–204:2. Magistrate Judge Pohorelsky sentenced

---

[2] Sergeant Rodriguez's full name is not in the record. *See* Tr. at 154:21.

5

Defendant to a fine of $100 on the interfering charge only and a special assessment of $10 for each of the two counts. *Id.* at 211:13–15. Defendant timely appealed on May 14, 2012.

## STANDARD OF REVIEW

This court has jurisdiction over Defendant's appeal pursuant to Rule 58 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 58(g)(2)(B). In an appeal from a Magistrate Judge's judgment of conviction, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). On appeal, this Court reviews questions of law *de novo* and accepts the Magistrate Judge's factual determinations, unless clearly erroneous. *Gandia*, 424 F.3d at 261.

"[A] defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal citations and quotation marks omitted). In evaluating a sufficiency challenge, an appellate court must view the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Corsey*, Nos. 10-1800-cr(L), 10-2047-cr(CON), 10-3314-cr(CON), 2013 WL 3796393, at *5 (2d Cir. July 23, 2013). Although sufficiency review is *de novo*, *Coplan*, 703 F.3d at 62, this Court must affirm a conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Corsey*, 2013 WL 3796393, at *5 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## ANALYSIS

### I. Disorderly Conduct

Defendant asserts the Government did not present evidence sufficient to sustain a conviction under the disorderly conduct regulation. First, Defendant contends the Government

6

failed to prove that his conduct took place in "public," as required by the statute. Second, Defendant maintains the Government failed to prove he acted with a *mens rea* of at least recklessness. For the reasons described below, this Court rejects both arguments and affirms Defendant's conviction for disorderly conduct.

### A. The Public Conduct Requirement

The disorderly conduct regulation provides, in relevant part, that "[a] person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person . . . [e]ngages in fighting or threatening, or in violent behavior." 36 C.F.R. § 2.34(a)(1). Prosecutions for alleged violations of this regulation have been rare, and thus the federal courts have had few occasions to interpret it. *See, e.g., United States v. Mather*, 902 F. Supp. 560, 562 (E.D. Pa. 1995) (Dalzell, J.) (finding only five decisions regarding the regulation as of the date of decision), *aff'd*, 91 F.3d 127 (3d Cir. 1996); *see also United States v. Albers*, 226 F.3d 989, 994 (9th Cir. 2000) (noting that convictions under another provision of the regulation, § 2.34(a)(4), are "uncommon").

Although the Second Circuit has yet to interpret the disorderly conduct regulation, every court to have considered the question has concluded that the word "public" modifies not only "alarm," but also "nuisance, jeopardy or violence." *See, e.g., United States v. Taylor*, 258 F.3d 1065, 1068 (9th Cir. 2001). Consequently, courts have been unanimous in concluding, and both Defendant and the Government in this case agree, "that the disorderly conduct statute requires a public component to the proscribed behavior." *Id.*

The public component of a disorderly conduct charge can be satisfied in one of two ways. Under the first test, "activity that occurs in an inherently 'public' location . . . can be sufficient to support the disorderly conduct charge, whether or not members of the public are actually shown

7

to be present." Def.'s Br. at 17; *accord* Gov. Br. at 13; *see also United States v. Coutchavlis*, 260 F.3d 1149, 1154 (9th Cir. 2001) ("[T]he issue is not whether the public actually witnessed the act, but rather whether the act took place in a location accessible to the public."). Alternatively, where the conduct takes place in a location that is not inherently public, the public requirement is fulfilled by proving "that the conduct actually caused or risked public alarm, nuisance, jeopardy, or violence." Def.'s Br. at 16 (internal quotation marks omitted); *accord* Gov. Br. at 13; *see also Taylor*, 258 F.3d at 1066 (public component not satisfied where conduct occurred in a private rented cabin, where no other individuals were present except the defendant and officer, and where there was no evidence of actual or risked public alarm, nuisance, jeopardy, or violence).

### 1. Defendant's Conduct Occurred in an Inherently Public Location

Affirmance is appropriate in this case because Defendant's conduct took place at Canarsie Pier, which is part of Gateway National Park. *See* Tr. at 199:4—5. "[P]arks have immemorially been held in trust for the use of the public," *United States v. Albers*, 226 F.3d 989, 995 (9th Cir. 2000) (quoting *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring)) (internal editing omitted), and consequently it is well established that "a national park is the quintessential public place," *Mather*, 902 F. Supp. at 564 (concluding that a park is a public place for purposes of the federal disorderly conduct regulation). Those portions of national parks and recreation areas that are open to the general public are inherently public locations, and conduct that occurs in such areas "can be sufficient to support the disorderly conduct charge, whether or not members of the public are actually shown to be present." Def.'s Br. at 17; *see, e.g., Albers*, 226 F.3d at 995 (holding that BASE jumping in a national recreation area was public for purposes of the disorderly conduct regulation, even

8

though no other persons were present); *Coutchavlis*, 260 F.3d at 1155 (affirming conviction for disorderly conduct where behavior took place on a public road in a national park, even though no members of the public were present). In this case, there is no dispute that Defendant's conduct took place in the parking lot at Canarsie Pier, an area that is within Gateway National Park and is open to and used by the general public. Accordingly, Defendant's conduct occurred in an inherently public location, thereby satisfying the public requirement of the disorderly conduct charge.

Defendant urges this Court to adopt a test under which inherently public locations, like national parks, would cease to be public during those hours when they are closed. *See* Def.'s Br. at 16 (arguing that Canarsie Pier is not inherently public "as it was closed to the public at the time of the activity and had been cleared of all visitors by the officer himself"). Defendant cites no authority for this proposition, nor is this Court aware of any. Instead, Defendant points this Court to a handful of decisions concluding that conduct occurring in a public park had nonetheless taken place in a private space because the conduct transpired in an area that had been rented or allotted to specific individuals. For example, in *United States v. Schaffer*, a California district court held that conduct in a cabin in Yosemite Park that had been rented by a family had occurred "in a private place" and therefore that the public element of the disorderly conduct statute had not been met. No. CR F 09–0352, 2010 WL 347982, at *6 (E.D. Cal. Jan. 29, 2010) (O'Neill, J); *see also Taylor*, 258 F.3d at 1068 (conduct which took place in the cabin of an employee at Yosemite National Park did not meet the public conduct requirement). These decisions regarding a "private, reserved area inside of the public park," *Schaffer*, 2010 WL 347982, at *6, do not apply to Canarsie Pier, which is a public parking lot. Unlike a cabin, which becomes private upon rental, a public parking lot in a public park does not suddenly

become private when the park closes for the night. To the contrary, public spaces remain public spaces, even after closing. Accordingly, this Court declines to hold that inherently public locations cease to be public during those hours when they are closed.

### 2. Defendant's Conduct Created a Risk of Public Alarm, Nuisance, Jeopardy, or Violence

Even if this Court were inclined to accept Defendant's argument that Canarsie Pier was not an inherently public location at the time of the incident, affirmance would still be appropriate on the disorderly conduct charge. At trial, Defendant Etzel testified, and Magistrate Judge Pohorelsky found, that there were three fishermen present on the pier after Officer Etzel announced the pier's closing. Tr. at 21:16–18, 104:3–7, 199:14–15. Taking this evidence and any inferences to be drawn from it in the light most favorable to the Government, as this Court must, this Court concludes that a rational factfinder could have found that Defendant's conduct affected "persons in a place to which the public . . . has access" and recklessly created a risk of "public alarm, nuisance, jeopardy or violence," thereby violating the disorderly conduct regulation. *Coutchavlis*, 260 F.3d at 1154; *see also United States v. Dearing*, 872 F.2d 431 (9th Cir. 1989) (affirming conviction for disorderly conduct based on conduct which occurred in a national park at a picnic table where three other individuals were nearby).

Defendant argues that Officer Etzel's "vague statement that he 'believe[d] there were three fishermen . . . on the southeast corner of the pier,'" was "not sufficient . . . [to] establish the presence of any members of the public." Def.'s Br. at 21. Magistrate Judge Pohorelsky specifically found otherwise, Tr. at 199:14–15, and thus Defendant's argument asks this Court, in essence, to overturn that factual finding. On appeal from a judgment of conviction, however, this Court must accept the Magistrate Judge's factual determinations, unless clearly erroneous. *Gandia*, 424 F.3d at 261. Officer Etzel twice testified that he saw three fishermen on the

southeast corner of the pier. Tr. at 21:16–18 ("I believe there were three fishermen in the corner on the southeast corner of the pier."), 104:3–7 (Q: "But on direct examination you said everyone had left." A: "Well I meant the – all the vehicles had left. There was still people – three people on the pier. Q: "The three fishermen?" A: "Yes."). The Defendant had an opportunity to, and did, in fact, cross-examine Officer Etzel about this testimony, eliciting an admission that the presence of three fishermen was not mentioned in Officer Etzel's supplemental criminal incident record or in the violation notice Defendant received for this charge. *Id.* at 104:8–18; Dkt. No. 1 (violation notices). After hearing this testimony, Magistrate Judge Pohorelsky, who had an opportunity to observe and evaluate the witness and his demeanor, specifically found that there were three fishermen on the pier, despite the admissions elicited on cross-examination. Tr. at 199:14–15. That determination was not clearly erroneous.

### B. The *Mens Rea* Requirement

The disorderly conduct regulation provides that "[a] person commits disorderly conduct when" he or she commits certain acts "with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creat[es] a risk thereof." 36 C.F.R. § 2.34(a). The term "recklessly" is not defined in the regulation, and courts applying the regulation have therefore turned to the Model Penal Code ("MPC") to interpret the term. *See, e.g., Albers*, 226 F.3d at 995. Under the MPC, "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." MPC § 2.02(2)(c).

Defendant maintains the Government failed to prove he acted with a *mens rea* of at least recklessness because Defendant "could not have imagined—let alone formed a knowing or reckless intent to cause—any kind of 'public' reaction to his actions" in a "closed parking lot that

11

had been emptied of all other occupants." Def.'s Br. at 22. This argument ignores consistent case law holding that where conduct occurs in a public area of a national park, the *mens rea* requirement is met regardless of the presence of other individuals because a defendant knows there is always a risk that other persons could pass by and become alarmed or jeopardized by the conduct. *See, e.g., Coutchavlis*, 260 F.3d at 1155; *Mather*, 902 F. Supp. at 564–65. Even a closed park may contain some persons, such as lovers seeking a discreet place for a rendezvous, juvenile delinquents breaking their curfews, or homeless individuals looking for a place to sleep for the night. Indeed, Defendant's argument to the contrary—that the park was no longer public upon closure—is belied by reality, since both Defendant and three fishermen were in the park after it closed. *See* Tr. at 199:14–15. Accordingly, a rational trier of fact could conclude, as Magistrate Judge Pohorelsky did here, that Defendant "'deliberately disregarded a substantial and unjustifiable risk' that his actions would create a risk of public alarm." *Coutchavlis*, 260 F.3d at 1155.

## II. Interfering with an Officer

Defendant was also convicted of interfering with and resisting an officer in violation of 36 C.F.R. § 2.32. That regulation prohibits "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." 36 C.F.R. § 2.32(a)(1).

A refusal to follow an officer's orders followed by flight from the scene violates 36 C.F.R. § 2.32(a)(1). *United States v. Thorpe*, 122 F.3d 1058 (2d Cir. 1997). In *Thorpe*, police officers observed a marijuana cigarette in the possession of two passengers in a car driven by the defendant. *Id.* at *1. The police officers ordered the defendant and his passengers to get out of the vehicle and place their hands on the vehicle. *Id.* Defendant refused to place his hands on the

car and then fled across the parking lot and into a restroom, where he was arrested. *Id.* The Second Circuit held that officers had probable cause to arrest defendant for interfering with an officer engaged in an official duty based on defendant's "refusal to place his hands on the car and his flight from the scene." *Id.* at *2. As in *Thorpe*, Defendant's refusal in this case to follow the legitimate orders of an officer, coupled with his subsequent flight, provided Officer Etzel with probable cause to arrest him, and, in this case, sufficient evidence to convict him, of interfering with an officer under 36 C.F.R. § 2.32(a)(1).

Defendant does not dispute that his actions were sufficient to violate the regulation, but argues the evidence was insufficient to prove that he formed the "specific intent" to interfere with an officer, as required under the regulation, because his actions were undertaken reflexively and therefore involuntarily. Def.'s Br. at 23–25. According to Defendant, "the evidence presented simply reveals a panicked individual acting as a result of fear and pain, without forming the specific intent that is required to support the charge." *Id.* at 24.

Although the relevant regulation does not explicitly include a *mens rea* requirement, courts interpreting the regulation have held it "includes a mens rea element of willfulness." *United States v. Bibbins*, 637 F.3d 1087, 1091 (9th Cir. 2011). Such courts have avoided "casting [their] analysis in terms of 'specific intent' and 'general intent,' because these expressions have long been 'the source of a good deal of confusion.'" *Id.* at n.5 (quoting *United States v. Bailey*, 444 U.S. 394, 403 (1980)). Following that sensible practice, this Court holds that a *mens rea* of willfulness is required under 36 C.F.R. § 2.32(a)(1).

Defendant's actions clearly met the willfulness requirement. Magistrate Judge Pohorelsky found that Defendant "grabbed Officer Etzel's hand," "broke away from" Officer Etzel, "ran to the rear" of his vehicle, "opened the tailgate," did not comply with Officer Etzel's

13

instructions to get down on the ground, "bolted towards the driver's door," and ultimately "drove away." Tr. at 200–01. A rational trier of fact could conclude, as Magistrate Judge Pohorelsky did, that this series of actions constituted a conscious attempt to evade Officer Etzel, rather than a simple reflex. *See, e.g., Bibbins*, 637 F.3d at 1093 (holding defendant willfully violated the regulation where he "tensed his arms and made fists, jerked his right arm out of [the officers'] grip, did not get on the ground when ordered to do so, and rotated his body to the right"). Moreover, contrary to Defendant's contention, evidence that Defendant may have acted out of fear and pain, at least in part, does not negate this *mens rea*. *Id.* (holding a rational factfinder could find that defendant's conduct was willful even though his actions were the result of severe pain from a broken leg).

### III. Evidentiary Rulings

### A. Disclosure of Officer Etzel's Disciplinary Records

In *Giglio v. United States*, the Supreme Court held the prosecution's obligation to disclose *Brady* material extends to evidence that may be used to impeach a witness. 405 U.S. 150, 153–55 (1972). That obligation, however, does not require the prosecutor to deliver to a defendant all of the evidence in the prosecutor's possession. *United States v. Preldakaj*, 456 F. App'x 56, 59 (2d Cir. 2012). "Rather, only *material* impeachment evidence must be disclosed." *Id.* (emphasis in original). Evidence is material, and therefore must be disclosed, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (*Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

Defendant argues the Government failed to meet its *Giglio* obligation in this case, and therefore denied Defendant his due process right to a fair trial, when it failed to disclose Officer

Etzel's disciplinary records to the defense, despite multiple requests for the information. Def.'s Br. at 25–30. It is undisputed, however, that the evidentiary records in question showed only that Officer Etzel had received several demerits for lateness, years ago. Gov. Br. at 7; Tr. at 139:25–140:4. Undisclosed impeachment evidence is not material when, "although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) (quoting *Giglio*, 405 U.S. at 154). In this case, Magistrate Judge Pohorelsky rejected as irrelevant Defendant's argument that evidence of Officer Etzel's demerits for lateness several years ago might have demonstrated bias and a motive to lie so as to avoid additional disciplinary action. Tr. at 140:12–141:14.

This Court agrees that evidence of Officer Etzel's demerits for lateness several years earlier was neither probative nor likely to have changed the verdict in this case, and thus that such evidence was not material within the meaning of *Giglio*. *See Avellino*, 136 F.3d at 257. Consequently, this Court denies Defendant's request to vacate the conviction and remand for a new trial on the basis of the non-disclosure of Officer Etzel's disciplinary records. *See United States v. Agurs*, 427 U.S. 97, 112–13 (1976) ("If there is no reasonable doubt about guilt whether or not the additional evince is considered, there is no justification for a new trial.").

### B. Admission of Government Exhibits 3, 4, and 5

Magistrate Judge Pohorelsky admitted, over Defendant's objections, three documents prepared by Officer Etzel: (1) Government Exhibit 3, the violation notice for interfering with an officer; (2) Government Exhibit 4, the supplemental criminal incident record; and (3) Government Exhibit 5, the electronic control deployment sheet. Tr. at 84:20–85:4, 125:3–133:16. Defendant argues these documents constituted inadmissible hearsay and were improperly admitted. Def.'s Br. at 30–35.

15

A trial court's evidentiary rulings are entitled to deference, and should only be reversed for abuse of discretion. *United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," or if its decision "cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), and *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). However, "the admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis." *Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001).

In this case, Government Exhibits 3, 4, and 5 were offered by the Government after defense counsel attempted to impeach Officer Etzel by questioning him about omissions in these reports. Tr. at 125:3–133:16. The Government argued, and Magistrate Judge Pohorelsky found, that the documents were admissible under Federal Rule of Evidence 801(d)(1)(B) to rebut a charge of recent fabrication. *Id.* at 126:4–133:16. The Government also argued it was offering these documents "to provide context" for the allegedly inconsistent statements and therefore "rebut[] the claim [of] prior inconsistent fabrication," *id.* at 129:3–7, a somewhat imprecise formulation that was apparently intended to invoke Federal Rule of Evidence 106.

Under the doctrine of completeness, codified as Federal Rule of Evidence 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Rule 106 requires admission of a document "when it is essential to explain an already admitted document, to place the admitted document in

context, [] to avoid misleading the trier of fact," or "when it is necessary for the fair and impartial understanding of the admitted portion of the document or a related document." *United States v. Lyttle*, 460 F. App'x 3, 7 (2d Cir. 2012) (internal citations, quotation marks, and editing omitted), *cert. denied*, 133 S. Ct. 310 (2012). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 1794 (2013).

Here, Defense counsel referenced Exhibits 3, 4, and 5 to attack Officer Etzel's credibility, focusing on their omission of particular facts to which Officer Etzel testified at trial, such as whether Officer Etzel grabbed Defendant's arm, whether Defendant reached into the tailgate, and whether three fishermen were present. *See, e.g.*, Tr. at 90:16—107:23. The significance of these omissions could hardly be evaluated without reviewing the contents of the exhibits, particularly because some of the alleged omissions arguably were contained in the exhibits, contrary to Defendant's contention. For example, defense counsel elicited an admission from Officer Etzel that none of the exhibits included a statement that Officer Etzel had grabbed Defendant's arm. *Id.* at 90:15—93:20. In fact, Exhibit 3 stated that Officer Etzel "attempted to handcuff" Defendant, App. at 3, Exhibit 4 stated that Officer Etzel tried to detain the Defendant, App. at 283, and Exhibit 5 stated that "Officer attempted to grab suspect and handcuff him," App. at 284. Similarly, defense counsel elicited an admission from Officer Etzel that neither the violation notice nor the supplemental criminal incident record mention that Defendant yelled "Go ahead and tase me." *Id.* at 99:1–100:24. This statement does, however, appear in the electronic control deployment sheet. App. at 284. Only through review of these documents could the Court have a "fair and impartial" understanding of whether, and the extent to which, Officer Etzel's testimony

17

at trial was inconsistent with his statements in these documents. Consequently, this Court holds that Government Exhibits 3, 4, and 5 were admissible under the doctrine of completeness.[3] *See United States v. McDarrah*, No. 05 Cr. 1182, 2007 WL 273799, at *9–10 (S.D.N.Y. Jan. 31, 2007) (Crotty, J.) (holding that officer's notes and report, which had been used by defense counsel to impeach the officer, were admissible under Federal Rule of Evidence 106).

## CONCLUSION

For the foregoing reasons, Defendant's convictions for interfering with an officer and disorderly conduct are AFFIRMED.

## SO ORDERED

Dated: Brooklyn, New York
October 8, 2013

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge

---

[3] Because this Court concludes that the disputed exhibits were admissible under Federal Rule of Evidence 106, it is unnecessary to determine whether the exhibits were also admissible under Federal Rule of Evidence 801(d)(1)(B). Although it is true that Rule 106 "does not compel admission of otherwise inadmissible hearsay evidence," *U.S. Football League v. National Football League*, 842 F.2d 1335, 1375–76 (2d Cir. 1988), in this case, the disputed exhibits were introduced for the purpose of determining whether the information and omissions they contained indicated that Officer Etzel was not credible. That is a non-hearsay purpose and, accordingly, the exhibits were admissible under Federal Rule of Evidence 106. *See McDarrah*, 2007 WL 273799, at *10.